UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

P.L. and M.L., individually and
on behalf of M.L.,

               Plaintiffs,

               **MEMORANDUM & ORDER**

     -against-              12-CV-2097 (PKC) (VMS)

NEW YORK CITY DEPART OF EDUCATION.,

               Defendant.

--------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

       Plaintiffs P.L. and M.L., individually and on behalf of M.L. ("Plaintiffs"), bring this action against the Defendant New York City Department of Education (the "DOE") pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. §1400 *et seq.* Specifically, Plaintiffs seek reimbursement of M.L.'s 2010-11 tuition at the Imagine Academy, a private school for students with autism spectrum disorders in Brooklyn.  Having exhausted the state administrative process, which terminated in the DOE's favor, Plaintiffs now seek review of those proceedings in this Court.  The parties have cross-moved for summary judgment based solely on the state administrative record.

       Because the DOE has not carried its burden of demonstrating that the program it proposed for M.L. was reasonably calculated to enable M.L. to make meaningful educational gains, the DOE did not provide M.L. with a free and appropriate public education.  Therefore, Plaintiffs' motion is granted and the DOE's motion is denied.

# BACKGROUND

## I.      The Legal Framework

The facts surrounding the instant litigation are better understood after a review of the procedures and remedies available to IDEA-qualified students and their parents.

Under the IDEA, New York state is required to provide disabled children with a free and appropriate public education ("FAPE").  *M.W. ex rel. S.W. v. New York City Dep't of Educ.,* 725 F.3d 131, 135 (2d Cir. 2013).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each [disabled] child."  *R.E. ex rel. J.E v. New York City Dep't of Educ.,* 694 F.3d 167, 175 (2d Cir. 2012).  An IEP is a written statement that "describes the specially designed instruction and services that will enable the child to meet stated educational objectives and is reasonably calculated to give educational benefits to the child."  *M.W.,* 725 F.3d at 135 (citing *R.E.,* 694 F.3d at 175) (internal quotation marks omitted); *see also* 20 U.S.C. § 1414(d).  In New York, local Committees on Special Education ("CSE") are responsible for determining whether a child is entitled to educational services under the IDEA and, if so, developing an appropriate IEP.  N.Y. Educ. Law § 4402(1)(b)(1); *M.W.,* 725 F.3d at 135; *R.E.,* 694 F.3d at 175.

If parents believe that the recommendations in the prepared IEP will not provide their child with a FAPE, those parents may unilaterally place the child in a private school or program at the parents' own expense and later seek tuition reimbursement.  *M.W.,* 725 F.3d at 135 (citation omitted); *see also* 20 U.S.C. §1400(d)(1)(A).  In New York, a parent may initiate the tuition reimbursement process by filing a due process complaint with the DOE.  *M.W.,* 725 F.3d at 135.  The due process complaint commences administrative proceedings that initially involves

a hearing before an Impartial Hearing Officer ("IHO"). *Id.* (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).

The IHO applies the three-pronged *Burlington/Carter* test, under which: "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *Id.* (citing *R.E.,* 694 F.3d at 184-85).[1] "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education." *M.H. v. New York City Dep't of Educ.,* 685 F.3d 217, 225 (2d Cir. 2012). Any party aggrieved by the SRO's final administrative decision has the right to seek review of the decision by bringing a civil action in federal court. *See M.W.,* 725 F.3d at 135-36; 20 U.S.C. § 1415(i)(2)(A).

## II. <u>Relevant Facts</u>

The material facts in this case, drawn primarily from the administrative record, are not in dispute. M.L. has been classified by the DOE's CSE as a student with autism who is entitled to receive appropriate special education and related services under the IDEA. (Pl. 56.1 ¶ 1-2.)[2] A 2007 private psychological investigation found that M.L.'s "speech-language, socialization, and communication impairments 'clearly' impeded his ability to function at home and at school." (SRO Dec.[3] at 2.) Beginning in November 2007 and through the 2010-11 school year, M.L.'s

---

[1] The *Burlington/Carter* test is derived from a pair of Supreme Court cases: *Sch. Comm. Of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985) and *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12-13 (1993).

[2] Citations to "Pl. 56.1" refer to Plaintiffs' Statement of Material Facts pursuant to Local Rule 56.1. (Dkt. 20.) Citations to "Def. 56.1" refer to the DOE's Statement of Material Facts pursuant to Local Rule 56.1 (Dkt. 23).

[3] Documents from the administrative record have been filed with the Court under seal.

parents unilaterally placed M.L. at Imagine Academy, a private school for autistic students that has not been approved by the New York State Commissioner of Education as a school with which districts may contract to instruct students with disabilities.[4]  (Def. 56.1 ¶ 7;  Pl. 56.1 ¶ 4.) While at Imagine Academy, M.L. received 1:1 classroom instruction.  (IHO Dec. 6.)

In May 2010, when M.L. was thirteen years old (Pl. 56.1 ¶ 17), the CSE developed an IEP for M.L. for the 2010-11 school year.  (Def. 56.1 ¶ 8.)  In drafting the IEP, the CSE relied on various data regarding M.L.'s levels of performance at Imagine Academy, as well as the input of M.L.'s parents, and his teacher, speech-language pathologist, occupational therapist, and principal from the 2009-2010 school year.  (*Id.* ¶¶ 10-11.)

M.L.'s speech-language pathologist found that M.L.'s language and conversational skills were improving, but certain disruptive behaviors remained, such as a propensity to spit, scratch, or pinch when frustrated with a task, and recommended that M.L. receive continued speech-language therapy throughout the next 12-month period.  (SRO Dec. 3.)  M.L.'s occupational therapist similarly noted certain improvements in M.L.'s behaviors, such as being more relaxed and able to enjoy physical challenges, but recommended the provision of twice weekly 45-minute sessions of 1:1 occupational therapy ("OT") and twice weekly 45-minute sessions of group OT to work toward improved body awareness, self-regulation, and bilateral hand usage. (*Id.* at 4.)  M.L.'s classroom teacher reported the same types of behavioral problems as noted by the speech-language pathologist, and reported that M.L. needed consistent supervision and encouragement in the classroom.  (*Id.*)  The teacher recommended that M.L. would benefit from continued provision of 1:1 instruction at Imagine Academy.  (*Id.*)

_____

[4]  Neither party has raised an issue about M.L.'s IEP for the years prior to the 2010-11 school year.  It is, in any event, not directly relevant given that Plaintiffs seek reimbursement only for the 2010-11 school year.

The IEP that the CSE developed in May 2010 recommended a 12-month program with placement in a class at a specialized school consisting of a 6:1:1 student-to-teacher-plus-paraprofessional classroom ratio, along with twice weekly 1:1 OT, twice weekly small-group OT, three times weekly 1:1 speech-language therapy, and twice weekly small group speech-language therapy. (*Id*. at 5.)

In a letter dated June 25, 2010, the school district (the "District") summarized the recommendations of the May 2010 CSE, and notified M.L.'s parents of the public school to which M.L. was assigned for the 2010-11 school year. (*Id*. at 5.) On August 18, 2010, M.L.'s mother wrote a letter to the CSE advising that she had yet to receive notice of the assigned school for M.L. (*Id*.) In addition, the letter stated that M.L.'s parents were rejecting the May 2010 IEP as deficient in its evaluation and the goals set for M.L. (*Id*.) It also notified the District of the parents' intent to re-enroll M.L. at Imagine Academy for the 2010-11 school year, and requested an impartial hearing before the IHO to seek the reimbursement of the costs of M.L.'s tuition. (*Id*.)

Shortly thereafter, M.L.'s parents received a Final Notice of Recommendation offering M.L. a placement in a 6:1:1 classroom at P. 141@35K ("P.S. 141"), a local public school. (IHO DOE Ex. 3.) M.L.'s mother visited P.S. 141 on September 14, 2010. (SRO Dec. 5.) By letter dated September 28, 2010 to the CSE, M.L.'s parents stated that the proposed school was "too overwhelming," and that M.L. would have difficulty navigating the stairs frequently during the day. (*Id*. at 5.) The letter also noted that M.L.'s social and emotional needs differed from those of the students in the recommended program. (*Id*.) M.L.'s parents restated their rejection of the May 2010 IEP on the grounds that it did not meet the social, emotional, or behavioral needs of M.L., nor did the assigned school have sufficient support to meet them. (*Id*.) Finally, the parents

reiterated that they planned to enroll M.L. at Imagine Academy, and seek reimbursement through an impartial hearing. (*Id.* at 6.)

M.L. attended Imagine Academy for the entire 2010-11 school year. (Pl. 56.1 ¶ 57.) M.L.'s parents assert that they paid the required $77,500 tuition amount in full. (IHO Dec. 3.)

## III.     Due Process Complaint Notice

In their due process complaint notice dated February 16, 2011, M.L.'s parents contended that the DOE denied M.L. a FAPE during the 2010-11 school year. (SRO Dec. 6.) M.L.'s parents raised the followings issues with respect to the May 2010 IEP:   (1) the IEP's description of M.L.'s present levels of performance were insufficient to provide an adequate baseline from which to determine M.L.'s progress, "as there is minimal to no information regarding [M.L.'s] academic and living skills;" (2) the lack of evaluation of M.L.'s academic and living skills resulted in the development of insufficient goals, particularly with respect to academics, independent living skills and socialization; (3) the District failed to provide for parent training and counseling in the IEP, in violation of State regulations; and (4) despite developing a behavioral intervention plan ("BIP") to address M.L.'s aggressive behaviors, the CSE failed to conduct a functional behavioral assessment ("FBA") to determine the causes of these behaviors. (IHO Parents' Ex. 1 at 1-2.)

With respect to the insufficiency of the proposed placement (P.S. 141), M.L.'s Parents contended that the "school is too large and overwhelming given [M.L.]'s speech and language needs;" M.L. would have difficulty navigating the stairs; and the students in the recommended class had different needs than M.L. (*Id.* at 2.) The parents also pointed out that the proposed program could not meet M.L.'s *behavioral* needs, specifically:

> "The program does not offer sufficient 1:1 instruction and support to address [M.L.]'s delays. Further, the parent was informed that [M.L.]'s related

service mandates as per the May 14, 2010 IEP would [not] be met at the recommended placement. The program would require [M.L.] to travel independently with a Metro Card to alternate placements in order to receive related services. This is inappropriate given [M.L.]'s delays."

(*Id.*)

As a proposed resolution, the Parents requested tuition reimbursement for the 2010-11 school year at Imagine Academy. (*Id.*)

## IV.    **IHO Proceedings**

The IHO held a hearing over the course of four days in June and July 2011. (IHO Dec. 2) The DOE presented two witnesses: (1) Benjamin Shu ("Mr. Shu"), a special education teacher assigned to the CSE who conducted an observation of M.L. and who participated in the CSE review; and (2) Grace Schaefer ("Ms. Schaefer"), the teacher of the class in which M.L. would have been placed at P.S. 141 had M.L.'s parents accepted the IEP. (*Id.*) Mr. Shu was the sole DOE witness to testify concerning the formulation of the IEP. (*Id*. at 5.)

Applying the *Burlington/Carter* test, the IHO conducted a thorough analysis regarding prong one, namely whether the services offered by the DOE to M.L. in the IEP were adequate. (*Id* at 4-8.) In summarizing her conclusions that were favorable to the DOE, the IHO noted that the testimony of M.L.'s parents indicated that M.L.'s present levels of academic performance and learning characteristics were accurately depicted in the May 2010 IEP. (*Id*. at 6.) The IHO further found that goals for M.L. were discussed at the May 2010 CSE meeting, and noted that the attending parent did not object at that time, and that Imagine Academy's principal deemed the goals appropriate. (*Id.*) She further found unavailing the parents' claim that the May 2010 IEP was deficient because it did not provide for parent training and counseling, noting that some parent training was provided by the proposed assigned school. (*Id.*)

Notwithstanding those peripheral findings in favor of the DOE, with respect to the primary substantive defect alleged, the IHO concluded that the DOE failed to establish that the program it proposed, namely 6:1:1, was reasonably calculated to enable M.L. to make meaningful educational gains. (*Id.* at 7.) In support of this finding, the IHO wrote:

> "The CSE acknowledged that [M.L.] had substantial deficits including severe global delays in expressive and receptive language as well as various aggressive and elopement behaviors. (Ex. 5) Although the IEP fails to specify [M.L.]'s academic levels, [Imagine Academy] staff testified that they were at pre-kindergarten to kindergarten levels for reading, math and listening comprehension. (T. 414-417) That testimony was not contested. [M.L.] has been receiving [a] one to one program at [Imagine Academy]. [The DOE] acknowledged that [Imagine Academy] staff informed the CSE that [M.L.] continued to require one to one instruction."

(*Id.*)

Importantly, with respect to the weight of her conclusion, the IHO noted that "the CSE virtually relied upon [Imagine Academy] to prepare a substantial portion of the IEP[,] which it incorporated into the IEP without alternation." (*Id.*) The CSE nevertheless rejected Imagine Academy's ultimate recommendation that M.L. receive 1:1 supervision. (*Id.*) The IHO found that the documents considered by the CSE did not provide a basis to conclude that the program it had recommended for M.L. would be appropriate. (*Id.*) In analyzing those documents, the IHO found that:

> "[The] Educational Progress Report (Ex. 8) notes behaviors including spitting, scratching, pinching and kicking for a variety of reasons including escape from challenging work, attention and frustration[,] and the use of these behaviors to express himself. It also notes leaving the room without permission and unresponsiveness to adult instructions to stop[,] as well as difficulty in remaining attentive during work sessions. The Speech and Language Annual review (Ex. 9) confirms this. The only psychological evaluation before the CSE (Ex. 6) was conducted in October 2007[,] and does not contradict these reports."

(*Id.*)

In her determination that M.L. required one-to-one support, the IHO noted the persuasive testimony of Dr. Zingervic, M.L.'s occupational therapist (T. 277); Ms. Heyman, M.L.'s speech therapist (T. 311); Ms. Coles, the Applied Behavior Analysis ("ABA") Director at Imagine Academy (T. 462, 469-471); Ms. Chem, the principal of Imagine Academy principal (T. 398-399, 403, 414); and M.L.'s mother (T. 356-357). (IHO Dec. 8.) The decision also noted that the IEP recommended 1:1 instruction for M.L.'s summer program. (*Id.*)

Mr. Shu was the only DOE witness at the hearing who had been involved in the preparation of M.L.'s IEP. With respect to the IEP, the IHO concluded that, "[a]lthough Shu observed [M.L.], the observation was done solely when [M.L.] was receiving one to one ABA instruction," and Mr. Shu did not observe M.L. in any other situation in preparation for the CSE review. (*Id.*) Moreover, the IHO noted the significance of the CSE's conclusion having been based solely on Mr. Shu's report and the fact that Mr. Shu's last observation of a 6:1:1 class had occurred five years earlier.[5] Further, Mr. Shu acknowledged "he had virtually no experience teaching autistic students (T. 107)[,] and there was no testimony concerning the participation and experience of the other DOE CSE member." (*Id.*) Finally, although the Imagine Academy staff reported, and the CSE agreed, that M.L.'s behaviors interfered with learning, no FBA was prepared to determine the extent and circumstances of M.L.'s behavioral issues. (*Id.*) As such, there was no support for the CSE's determination that M.L.'s behaviors could be adequately addressed in a 6:1:1 program. (*Id.*)

Accordingly, on September 15, 2011, the IHO ruled that the DOE had failed to offer M.L. a FAPE on the basis that the DOE had failed to establish that the IEP's proposed 6:1:1 program was reasonably calculated to enable M.L. to make meaningful educational gains, and

---

[5] The 6:1:1 class that Mr. Shu observed was not one in which M.L. was enrolled.

was therefore "substantively defective." (*Id.*) As such, the IHO did "not consider the other claims made by the parents concerning the IEP and the recommended placement." (*Id.*)

With respect to the second prong of the *Burlington/Carter* test, the IHO concluded that Imagine Academy was an appropriate placement. She found that evidence had shown that the Imagine Academy provides a "highly structured program" for M.L., primarily because he was receiving "one to one instruction all day." (*Id.* at 9.) Moreover, M.L.'s "expressive and pragmatic language needs were addressed. (T. 295, 297, 308) [M.L.]'s vocational and independent living needs were addressed (T. 407, 477-478) as were physical and sensory needs (T. 257-275). Parent training and counseling were provided. (T. 361, 409)." (IHO Dec. 9.) In fact, the "CSE acknowledged that progress was made in the 2010-11 school year (T. 33, 89, Ex. D)," which was also confirmed by the evidence. (IHO Dec. 9 (citing T. 463-464, 466-467, 477-478, Exs. 14, 16).)

During the hearing before the IHO, the DOE's "sole claim" with respect to Imagine Academy being an inappropriate placement was that M.L. required a 12-month program, which would include school during the summer, and Imagine Academy only provides a 10-month program. (*Id.*) Though the IHO agreed that M.L.'s need for a 12-month program was "well established," she found that this fact did not provide a basis for concluding that the 2010-11 program at Imagine Academy was inappropriate because by the time M.L.'s parents received the DOE placement offer, a 10-month program was sufficient to cover the remainder of the 2010-11 school year. (*Id.* at 10.)

With respect to the third prong of the *Burlington/Carter* test, the IHO found that the equities in the case favored Plaintiffs. In support of this conclusion, the IHO wrote:

> "There has been no claim that the parents failed to cooperate with the CSE in the development of the IEP. There is no claim or evidence that the parents were

informed that utilization of the summer program even absent a DOE placement offer would foreclose reimbursement for a unilateral placement that was not a 12 month program. Further, the parent credibly testified that in past years the DOE has provided placement offers late or not at all (T. 341, 343) and I conclude that her failure to make an inquiry was not unreasonable and does not indicate a lack of cooperation. I also note that the parent's credible claim that she did not receive the IEP until sometime in July (T. 366) has not been disputed or explained by the DOE. Further, it is well established that the parents' preference for a private school is not a bar to reimbursement. Accordingly, I conclude that equitable considerations do not warrant denial of reimbursement in the instant matter."

(*Id.*) Therefore, the IHO held that Plaintiffs were entitled to reimbursement from the DOE for up to $77,500 for the tuition they paid to Imagine Academy for the 2010-11 school year. (*Id.* at 11.)

## V.     SRO Proceedings

The DOE appealed the IHO's ruling to the SRO via verified petition on October 20, 2011, requesting the IHO's award of tuition reimbursement be vacated. (SRO Pleadings, Verified Peition.)

The SRO issued a decision, dated December 29, 2011, reversing the IHO's ruling and holding that the DOE had offered M.L. a FAPE for the 2010-11 school year, and therefore rejected Plaintiffs' request for tuition reimbursement. (SRO Dec. 21) The SRO found that the evidence in the hearing record showed that the CSE's recommended 6:1:1 program addressed M.L.'s needs. (*Id.* 20-21.) The SRO also concluded that the annual goals and short-term objectives listed in M.L.'s IEP were appropriate and, for the most part, measurable, and that no procedural violations significant enough to impede M.L.'s right to a FAPE had been raised by the CSE's actions. (*Id.* at 13-14.) The SRO noted that, as a result of his findings, he did not need to reach the second and third *Burlington/Carter* prongs, namely whether Imagine Academy was an appropriate placement for M.L. or whether equitable considerations supported the Plaintiffs' claim for reimbursement. (*Id.* at 21.) The SRO's findings are discussed in greater detail in the Discussion Section *infra.*

Plaintiffs filed the instant action in this Court appealing the SRO's determination on April 27, 2012. (Dkt. 1.)

## DISCUSSION

### I. <u>Standard of Review</u>

Although the parties seek relief via cross-motions for summary judgment, such a motion in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dept't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005) (quotation omitted); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative decisions.") (internal quotation marks and citation omitted)). The district court must conduct an independent judicial review to determine whether the SRO's decision is supported by "the preponderance of the evidence," based on the record from the administrative proceedings. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (citing 20 U.S.C. § 1415(i)(2)(B)); *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

"The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quotation marks omitted). "While the district court must base its decision 'on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009) (internal citations, quotations, and alterations omitted). Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.*, 725 F.3d at 139. "[D]eterminations regarding the

substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *M.H.,* 685 F.3d at 244.

Where, as here, the IHO and the SRO reach conflicting decisions, federal courts generally "must defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H,* 685 F.3d at 246. However, the deference owed to the SRO's decision "depends on the quality of that opinion." *R.E.*, 694 F.3d 167, 189. Specifically, the district court must consider "whether the decision being reviewed is well reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.,* 694 F.3d at 189 (quoting *M.H*., 685 F.3d at 244). Where an SRO's decision is insufficiently reasoned to merit the deference to which it is normally entitled, it is appropriate for the district court "to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment." *M.H.,* 685 F.3d at 246.

## II. <u>Plaintiffs' Appeal</u>

Plaintiffs argue that M.L's IEP was both procedurally and substantively defective.

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *R.E.*, 694 F.3d at 189-90. The procedural inquiry requires courts to examine "whether the state has complied with the procedures set forth in the IDEA." *Id.* at 190 (quoting *Cerra v. Pawling Cent Sch. Dist.*, 427 F.3d 186, 191 (2d Cir. 2005)). Procedural violations warrant reimbursement only if, individually or cumulatively, they "'impeded the child's right to a [FAPE],' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

Substantive inadequacy, on the other hand, "automatically entitles the parents to reimbursement." *Id.* The substantive inquiry requires courts to "examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* at 190. The IDEA does not "guarantee any particular level of education," or "require that a child be provided with the optimal programmatic alternative." *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014) (internal quotation marks and citation omitted). Instead, it requires "selection of a program that provides a basic floor of opportunity, and that is likely to produce progress, not regression." *Id.* (internal quotation marks and citation omitted).

A. Procedural Violations

Plaintiffs allege three procedural violations: (1) the CSE, in formulating M.L.'s IEP, did not consider sufficient evaluative material; (2) the CSE did not conduct an FBA before M.L.'s BIP was drafted; and (3) the IEP did not contain a recommendation for parent training or counseling. The Court addresses these arguments in turn below.

1. The SRO's Finding that the CSE Based the IEP on Sufficient Evaluative Data

Plaintiffs argue that the CSE, in formulating M.L.'s IEP, did not consider sufficient evaluative data and/or did not properly consider the evaluative data available to it. (Dkt. 21 ("Pl. Br." 8.) Specifically, Plaintiffs contend that the CSE committed procedural error by: (i) relying in part on a 2.5 year-old psychological evaluation of M.L., and failing to conduct a reevaluation; and (ii) failing to conduct an assessment of M.L. to determine M.L.'s preferences and interests for transitioning into adulthood.

First, with respect to the psychological examination, reexamination is required only if (i) the school district determines that one is warranted, (ii) M.L.'s parent or teacher requests one, or

(iii) the evaluation in question is three years old or older. 8 N.Y. Comp. Codes R. & Regs. tit. ("N.Y.C.R.R.") § 200.4(b)(4). Here, there is no indication that any party requested reevaluation (*see* DOE Ex. 13), and the evaluation in question was only 2.5 years old at the time of its use by the CSE. Where that is the case, the determination regarding whether reevaluation is warranted is, pursuant to the rule, expressly left to the school district. *Id.* ("A [CSE] shall arrange for an appropriate reevaluation of each student with a disability if the school district determines that . . . improved academic achievement and functional performance of the student[ ] warrant a reevaluation . . . ."). Although the additional evaluation certainly could have been useful in preparation of the IEP, the DOE was "within its discretion to determine, as it did, that no additional evaluation or testing was necessary." *E.E. v. New York City Dep't of Educ.*, 13-CV-06709 (LGS), 2014 WL 4332092, at *7 (S.D.N.Y. Aug. 21, 2014).

Second, Plaintiffs allege that the CSE's failure to conduct a vocational assessment caused M.L.'s IEP to be procedurally inadequate because "essential pre-vocational and independent living skills were not addressed at all in M.L.'s IEP." (Pl. Br. 9.) New York regulations require that covered "students . . . who are age 12 and over . . . receive an assessment . . . to determine vocational skills, aptitudes, and interests." 8 N.Y.C.R.R. § 200.4(b)(6)(viii). Plaintiffs are correct; the CSE's failure to conduct such an assessment for M.L., who was 13 at the time the IEP was prepared, constituted a procedural violation.

Nevertheless, the failure to conduct a vocational assessment, in and of itself, does not rise to the level of a FAPE deprivation. Where, as here, the CSE has sufficient information about the student to determine the student's educational needs, "[t]he absence of one single measure should not itself render an IEP invalid, so long as the CSE team otherwise has sufficient information about the student to determine the student's educational needs." *R.B. v. New York*

*City Dep't of Educ.*, 13-CV-01131 (AJN), 2014 WL 1618383, at *7 (S.D.N.Y. Mar. 26, 2014) (citation and quotation marks omitted). Here, at least six evaluations were considered by the CSE; ample information regarding M.L. was available. (SRO Dec. 2-4) Plaintiffs' argument really boils down to the position that because the IEP is substantively defective, the CSE must not have had enough information to properly assess M.L. As discussed below, the Court agrees that the IEP is substantively defective, but this defect stems from a misreading of the available evidence, not from the lack of the vocational assessment. Because the CSE is only required to "review existing evaluation data," 20 U.S.C. § 1414(c)(1), and "[a]ny additional assessments need only be conducted if found necessary to fill in gaps in the initial review of existing evaluation data," *S.F. v. New York City Dept. of Educ.,* 11-CV-870 (DC), 2011 WL 5419847, *10 (S.D.N.Y. Nov. 9, 2011), the Court finds that the lack of vocational assessment did not result in the denial of a FAPE.

### 2. Failure to Conduct an FBA

The IDEA requires that a school district developing an IEP for "a child whose behavior impedes" his learning must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(*i*). In New York, this rule is implemented through an FBA, which is an evaluative document that includes "the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." 8 N.Y.C.R.R. ¶ 2001(r). An FBA is required under New York's regulations when a student exhibits behaviors that "impede[] his or her learning or that of others." 8 N.Y.C.R.R § 200.4(b)(1)(v). However, failure to conduct an FBA does not

amount to a procedural violation of the IDEA where the IEP sets forth other means to address M.L.'s problematic behaviors. *A.C.*, 553 F.3d at 172.

Here, M.L.'s disruptive behaviors were well-known and were discussed at the CSE meeting. Imagine Academy provided a draft of the BIP, which was then "review[ed] and modif[ied]" by the CSE. (SRO Dec. 15-17; Tr. 50, 434, 437.) The IEP included a BIP that adequately described M.L.'s behaviors that interfere with learning, the behavior changes that were expected, strategies to be used to change the behavior and supports that would be employed to help M.L., including continuing provision of related services, a classroom paraprofessional, and small classroom environment. (DOE Ex. 5 at 18; Tr. 437.) Or, as the SRO put it, "the BIP contained information about [M.L.]'s behavior that interfered with learning that typically would be part of an FBA and BIP." (SRO Dec. 16.)

In response to that position, Plaintiffs claim that the BIP is defective because it does not identify "antecedent events" to problem behaviors or "intervention strategies" in sufficient detail. (Pl. Br. 16-17.) However, the information in the BIP was provided by M.L.'s own teachers, and it is clear from the testimony at the impartial hearing that the strategies were clear enough to provide a prospective teacher with enough guidance to implement them. (Tr. 189-90.) In fact, the IHO, despite finding for the Plaintiffs overall, concluded that the lack of an FBA was not an issue because the "CSE provided a BIP which included descriptive information provided by [Imagine Academy] concerning [M.L.]'s behaviors, the causes of those behaviors and various strategies." (IHO Dec. 6.) There were no objections to the BIP at the IEP meeting, nor did any party present (including M.L.'s parent, P.L.) state that further evaluations were needed. Indeed, Imagine Academy's principal testified that she agreed with the BIP (although she did not feel it could be implemented in a 6:1:1 setting). (*See* DOE Ex. 13; Tr. 420, 437). Ultimately, though it

may be considered a "serious procedural violation," given the circumstances of this case, the failure to conduct an FBA did not rise to level of denial of a FAPE. *R.E.*, 694 F.3d at 190 ("The failure to conduct an FBA will not always rise to the level of a denial of a FAPE, but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors.") (citing *A.C.*, 553 F.3d at 172).

### 3. Lack of Parent Training and Counseling

The failure to provide for parent training and counseling constituted a procedural violation, but did not rise to the level of denial of a FAPE. Under New York regulations, provision for parent counseling and training is to be made in an IEP, "for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." 8 N.Y.C.R.R. § 200.13. "The recommended program and services shall . . . indicate . . . the extent to which the student's parents will receive parent counseling and training . . . when appropriate." *Id*. at § 200.4(d)(2)(v)(b)(5). These regulations define such counseling and training as "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program." *Id*. at § 200.1(kk).

The Second Circuit, however, as with the failure to conduct an FBA described above, has instructed that the lack of a provision in an IEP for parent counseling and training does not inherently result in the denial of a FAPE. In particular:

> Although violating New York's regulations, the failure to include parent counseling in the IEP is less serious than the omission of an FBA. . . . [T]he presence or absence of a parent-counseling provision does not necessarily have a direct effect on the substantive adequacy of the plan. Moreover, because school districts are required by section 22.13(d) to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP. Parents can file a complaint at any time if they feel they are not receiving this service. . . . Though the failure to include parent counseling in the IEP may, in

some cases (particularly when aggregated with other violations), result in a denial
of a FAPE, in the ordinary case[,] that failure, standing alone, is not sufficient to
warrant reimbursement.

*R.E.*, 694 F.3d at 191 (citations omitted).

Here, the IHO rejected the parents' claim that the May 2010 IEP resulted in the denial of

a FAPE because at least some parent training was provided programmatically by the

recommended placement. (IHO Dec. 6.) The SRO likewise concluded that, "[a]lthough the

provision of parent counseling and training was not incorporated into the May 2010 IEP, the

hearing record reflects that the [IHO] correctly found it was provided programmatically." (SRO

Dec. 18 (citing IHO Dec. at 6; Tr. 59, 193-94).) After listing some of the specific parent training

programs that would have been provided "programmatically," the SRO "declined to find that the

district's failure to incorporate [parent training] into the May 2010 IEP resulted in a denial of a

FAPE to [M.L.]." (*Id.*)

As an initial matter, the IHO's and SRO's consideration of the programmatic parent

training constitutes improper reliance on "retrospective testimony." *See R.E.*, 694 F.3d at 186

(holding that services beyond those listed in the IEP may not be considered in a

*Burlington/Carter* analysis.). Specifically, the testimony that parent counseling would have been

provided "programmatically," or could have been provided based on parent requests is precisely

the kind of testimony may not be used to cure any deficiency on the face of the IEP. *See id.*; *see

also, e.g., P.S. v. New York City Dep't of Educ.*, 13-CV-04772 (LGS), 2014 WL 3673603, at *9

(S.D.N.Y. July 24, 2014) (holding that the SRO's reliance on testimony that parent counseling

was "programmatically" embedded constituted improper "retrospective evidence").

Nevertheless, the failure to provide for parent counseling and training does not rise to the

level of a FAPE violation. This is largely because school districts are required to provide

counseling for parents of covered children regardless of whether the counseling is specified in the IEP. *See R.E.,* 694 F.3d at 191 ("Moreover, because school districts are required . . . to provide parent counseling, they remain accountable for their failure to do so no matter the contents of the IEP."); *see also M.W.*, 725 F.3d at 142 (same). As such, even though the failure to provide parent counseling constitutes a procedural violation, it does not warrant tuition reimbursement. *See M.W.,* 725 F.3d at 141-42*; T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014) (holding that "parent counseling and training as part of [the student's] . . . program was not a sufficiently serious procedural violation to deny [the student] a FAPE.").

### 4. Cumulative Procedural Errors

In sum, the three procedural flaws with the IEP found by the Court, *i.e.*, the absence of a vocational assessment, the failure to conduct an FBA, and the lack of provisions for parent counseling, neither separately nor cumulatively rise to the denial of a FAPE. *See, e.g., R.E,* 694 F.3d at 193 (concluding that IEP's failure to provide for parent counseling and deficiencies in FBA did not cumulatively amount a violation of the IDEA). However, "the presence or absence of procedural violations informs [the Court's] determination of substantive adequacy" even when the violations themselves do not deny a FAPE. *C.F.*, 746 F.3d at 81; *see also N.S. v. New York City Dep't of Educ.*, 13-CV-7819 (VEC), 2014 WL 2722967, at *10 (S.D.N.Y. June 16, 2014) (noting that procedural violations "inform" the Court's analysis of the substantive adequacy of the IEP.") Further, any potential prejudice to Plaintiffs based on the above finding is mooted by the Court's finding, discussed below, that the IEP was substantively inadequate, which "automatically entitles the parents to reimbursement." *R.E.*, 694 F.3d at 190.

B.  Substantive Violations

Plaintiffs contend that the IEP was substantively inadequate in three respects:  (1) the IEP's proposed staffing ratio of 6:1:1 would not provide M.L. the necessary individualized attention; (2) the educational needs, goals, and objectives listed in M.L.'s IEP were insufficient; and (3) the specific placement offered to M.L. at P.S. 141 would not have been appropriate. Having reviewed the parties' arguments and the administrative record as a whole, the Court agrees with Plaintiffs that the DOE failed to show that the proposed 6:1:1 class was reasonably calculated to enable M.L. to make meaningful educational gains, and therefore the DOE did not provide M.L. with a FAPE for the 2010-11 school year.

1.  *Burlington/Carter* Prong One:  Inadequacy of the 6:1:1 Proposed Placement

Plaintiffs' primary challenge to the appropriateness of the IEP is ground in their assertion that the proposed placement of M.L. into a 6:1:1 classroom would not provide M.L. with the appropriate learning environment required by the IDEA, and thus fails to provide M.L. with a FAPE.  (Pl. Br. 1.)

The hearing before the IHO included myriad testimony and evidence regarding whether M.L. required one-on-one instruction throughout the day.  The witnesses included Imagine Academy faculty that had instructed and observed M.L. over the course of the 2010-11 school year, and their testimony uniformly supported the Plaintiffs' position that M.L. requires 1:1 instruction.

Ms. Heyman, M.L,'s speech therapist, testified that she had provided speech-language therapy to M.L.  for three and a half years, almost entirely in a 1:1 environment, and that M.L. "really benefited" from the 1:1 instruction. (T. 293, 311.)  Ms. Heyman described a particular instruction session at which one of her staff members had been absent, resulting in there being

one more student than teacher present at the session. (T. 311.) She testified that M.L. had a "really hard time" when he was in the 2:1 (two students, one teacher) situation, and walked off when not receiving individual instruction. (*Id.*)

Dr. Zingervic, the Director of OT at Imagine Academy, provided occupational therapy to M.L. three times per week for the 2010-11 school year. (Tr. 254-56.) Dr. Zingerevich testified that his therapy sessions with M.L. were always 1:1, with a single exception in which the session was 2:1. (Tr. 277.) At the 2:1 session, Dr. Zingerevich testified that M.L. was "not attentive at all" and would not participate in the session; Dr. Zingerevich attributed that behavior to the lack of 1:1 instruction. (*Id.*)

Ms. Coles, the Applied Behavior Analysis Director at Imagine Academy, testified that she worked with M.L. three to five times per week, and that M.L. worked "effectively with a one-on-one approach," (Tr. 459-62), but progress was much more challenging in a group larger than one-on-one. (T. 462-470.) She further testified that one "goal" for M.L. is to have him "move on from the one-on-one," but, though they have tried, she and her colleagues had not been able to successfully transition M.L. to 2:1 instruction. (Tr. 469-70.) Ms. Coles stated that during the attempt, M.L. exhibited problematic behavior such as spitting, hitting and throwing himself on the floor when he was receiving 2:1 instruction. (Tr. 470-71.)

Ms. Chem, the Principal of Imagine Academy, testified that she had known M.L. for four years, was formerly M.L.'s primary speech pathologist, and that for the 2010-11 school year she observed him every day during lunch period. (Tr. 390.) Ms. Chem testified that she did not think M.L. would learn in a classroom environment without 1:1 instruction due to his tendency toward distraction. (Tr. 399.) She testified that his distractibility was such that he could not work independently within a group for more than a minute. (Tr. 438.) She stated that staff at

Imagine Academy believed that placing M.L. in a 6:1:1 instruction setting was not advisable, as too much of M.L.'s time would be spent "not engaged in productive, active learning." (Tr. 414.)

On the basis of this record, and as discussed more fully *supra*, the IHO concluded that the [DOE] had not sufficiently established that placing M.L. in a 6:1:1 classroom was appropriate, and therefore it had not offered M.L. a FAPE. The SRO reversed the IHO's opinion, finding that the 6:1:1 classroom setting recommended in the IEP was reasonably calculated to enable M.L. to receive educational benefits, and therefore that the DOE had provided M.L. with a FAPE. (SRO Dec. 18-21.)

Marshalling the strongest argument for the SRO's conclusion, his decision appears to have relied on two pieces of evidence, although not equally: (1) marginally on Mr. Shu's testimony that M.L.'s needs and goals were similar to other students in the proposed 6:1:1 class; and (2) largely on Ms. Schaefer's testimony about how she *would have* implemented the goals and strategies in M.L.'s IEP at P.S. 141. Mr. Shu's anemic testimony and Ms. Schaefer's hypothetical—and substantially impermissible—testimony, as discussed below, were patently insufficient to support the SRO's reversal.

Mr. Shu was the only witness who had met M.L. to testify in *support* of placing M.L. in a 6:1:1 setting. (Tr. 58; IHO Ex. 4.) However, Mr. Shu, who was employed by the CSE, based his recommendation on a thirty-minute assessment of M.L. which took place on May 4, 2010. (*Id.*) During this assessment, Mr. Shu only observed M.L. in a 1:1 instruction setting. Perhaps because his knowledge of M.L. was so limited, Shu was unable to provide a rationale for the CSE's decision to offer M.L. a 6:1:1 setting in his IEP. Indeed, at the hearing, the most direct exchange regarding why the CSE team thought a 6:1:1 setting was appropriate went as follows:

[DOE Attorney]:       [T]urning back to the program recommendation, why did the team believe a 6:1:1 was appropriate for [M.L.]?

[Mr. Shu]:            6:1:1 is a program for the—autistic children, okay. There are a lot of programs—classes, programs 6:1:1. They have autistic children there. We just feel this is the most appropriate [recommendation].

(T. 47.)

Mr. Shu's testimony throughout the hearing reflected the seeming rationale behind the CSE's proposed IEP: the 6:1:1 placement is a standard proposal for children suffering from a certain kind of autism spectrum disorder, with less attention paid to M.L.'s particular situation. Mr. Shu's testimony was so cursory and general that its impact is almost nil, and whatever weight it could be given is largely nullified by the facts that Mr. Shu only observed M.L. for thirty-minutes once in 1:1 setting, had not observed a 6:1:1 class in more than five years, and acknowledged that he had virtually *no experience teaching autistic students*. (T. 58, 107-08.)

Although acknowledging that testimony regarding what the 6:1:1 placement *would have* been like at P.S. 141 was "speculative" (SRO Dec. 19), the SRO nonetheless relied primarily on the testimony of Ms. Schaefer, the special education teacher of the 6:1:1 class at P.S. 141 where M.L. had been assigned. (*Id.* at 20.) The problems with such reliance are two-fold: the testimony is unavailing, and it is largely impermissible.

First, it is unavailing. Ms. Schaeffer testified to the availability of 1:1 instruction at P.S. 141, but the SRO mischaracterized her testimony. The SRO, in furtherance of his conclusion that the May 2010 IEP addressed M.L.'s needs, stated that "[Ms. Schaefer] indicated that the assigned school was able to offer M.L. 1:1 instruction during the school day," and went on to imply that the level of instruction could be tailored to meet each student's needs, *i.e.,* that M.L. *would be* provided 1:1 instruction at P.S. 141. (*Id.*) However, the hearing transcript demonstrates that Ms. Schaefer testified that students in her class receive some amount of 1:1

instruction daily, which can vary student to student. (Tr. 168-70.) That variable level of instruction is quite different from the near-constant 1:1 instruction recommended, and provided, by the staff of Imagine Academy.

Equally important, Ms. Schaefer's testimony, even combined with Mr. Shu's, does nothing to rebut the testimony of the Imagine Academy witnesses that, based on their extensive experience with M.L., testified that M.L. required 1:1 instruction to learn new skills. The fact that some level of 1:1 instruction is available at P.S. 141 does not contradict the assertions by the Imagine Academy staff that M.L. required consistent 1:1 instruction. The SRO does not provide a basis for crediting the testimony of one teacher, Mr. Schaefer, who has no personal knowledge of M.L. over the team who had worked with M.L. for months and years.

Second, the SRO relied impermissibly on "retrospective testimony."[6] *See R.E.,* 694 F.3d at 186 (holding that the sufficiency of an IEP must be judged on its face, and "retrospective testimony that the school district *would have* provided additional services beyond those listed in the IEP may not be considered in a *Burlington/Carter* analysis.") (emphasis added.) This testimony is precisely the kind that is barred: "if a student is offered a staffing ratio of 6:1:1, a school district . . . . may not introduce evidence that modifies this staffing ratio (such as testimony from a teacher that he would have provided extensive 1:1 instruction to the student)." *R.E.*, 694 F.3d 167 at 187. That is exactly the testimony that Ms. Schaefer gave, and upon which

_____

[6] The Court, however, notes that the rule prohibiting "retrospective testimony" only definitively became the applicable law in this Circuit after the SRO rendered his decision in this case.

the SRO relied.[7]  Ms. Schaefer's testimony regarding 1:1 work cannot be used to cure the clear deficiency in the IEP.[8]  *See id.*

For the above discussed reasons, the SRO's decision with respect to appropriateness of a 6:1:1 class for M.L. was not "well-reasoned" or "based on substantially greater familiarity with the evidence and the witnesses that the reviewing court," and therefore merits no deference.  *See M.H.*, 685 F.3d at 244.  The Court therefore turns to the IHO's decision in determining the first prong of the *Burlington/Carter* test: the substantive adequacy of M.L.'s IEP.  *See R.E.*, 694 F.3d at 189 (citing *M.H.*, 685 F.3d at 246).

The IHO's more cogently reasoned decision correctly focuses on the appropriateness of the IEP's recommendation that M.L. be placed in a 6:1:1 setting.  The rationale supporting the IHO's decision is comprehensively set forth in Background Section IV.  It is clear that the opinion reflects a careful consideration of the testimony of the Imagine Academy staff, and takes into account several factors not addressed by the SRO.  For example, the IHO considered the fact that the CSE relied heavily on input from Imagine Academy staff when crafting much of the disputed IEP, yet, without explanation, rejected Imagine Academy's ultimate recommendation for a 1:1 class for M.L.  (IHO Dec. 7.)  The IHO's decision also considered and noted the limitations of Mr. Shu's testimony.  Finally, the decision weighed the fact that the IEP recommended 1:1 instruction for M.L.'s summer program, indicating recognition by the DOE that M.L. required that level of attention.  (*Id.*)

---

[7]  It is not totally clear that Ms. Schaefer's testimony can be characterized as suggesting that M.L. would receive *extensive* 1:1 instruction.  However, were such 1:1 instruction anything other than extensive, then it is, as discussed above, unavailing.

[8]  Nor, for the same reasons,  may the Court consider Mr. Shu's testimony that a 6:1:1 program would still result in M.L. receiving some 1:1 instruction every day.

Based on its own independent review of the administrative record, as discussed above, the Court agrees with the IHO that M.L. requires 1:1 instruction. The DOE has failed to establish that the IEP was appropriate to meet M.L.'s needs under the first prong of the *Burlington-Carter* test. Given that conclusion, the Court need not address Plaintiffs' alternate arguments (to the extent it has not already done so) regarding the insufficiency of the educational needs, goals, and objectives listed in M.L.'s IEP and that placement at P.S. 141 would not have been appropriate.

### 2. *Burlington/Carter* Prong Two: Appropriateness of Imagine Academy

The IHO correctly concluded that Imagine Academy provides a "highly structured program" for M.L., primarily because he receives "one to one instruction all day."[9] (*Id.* at 9.) Parents need only demonstrate that the placement is "reasonably calculated to enable the child to receive educational benefits. *Frank G v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.,* 459 F.3d 356, 364 (2d Cir. 2007) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982)). Here, Imagine Academy's programs and services met M.L.'s expressive and pragmatic language needs, (T. 295, 297, 308), his vocational and independent living needs (T. 407, 477-478), as well as his physical and sensory needs (T. 257-275). In addition, parent training and counseling were provided. (T. 361, 409.) Therefore, Imagine Academy was an appropriate placement for M.L.[10]

---

[9] As previously discussed, the SRO did not opine on the appropriateness of M.L.'s placement at Imagine Academy given his finding with respect to the first prong of the *Burlington Carter* test. The IHO's decision is, therefore, accorded due deference. *See, e.g., N.Y.C. Dep't of Educ. v. V.S.,* 10-CV-05120, 2011 WL 3273922, at *11 (E.D.N.Y. July 29, 2011) (hereinafter "*V.S.*").

[10] With respect to the DOE's claim that Imagine Academy is an inappropriate placement because M.L. requires a 12-month program and Imagine Academy provides only a 10-month program, the Court adopts the IHO's analysis in full. (*See* IHO Dec. at 9-10.) In short, by the time M.L.'s Parents received the DOE placement offer, a 10-month program was sufficient to cover the remainder of the 2010-11 school year, and was thus completely appropriate. The DOE

### 3. *Burlington/Carter* Prong Three:  Equities

With respect to prong three of the *Burlington-Carter* test, the Court must determine whether equitable considerations support Plaintiffs' claim for reimbursement.  *See R.E.*, 694 F.3d at 185.  The IHO found that the equities in the case favored Plaintiffs.  In support of this conclusion, the IHO wrote:

> "There has been no claim that the parents failed to cooperate with the CSE in the development of the IEP.  There is no claim or evidence that the parents were informed that utilization of the summer program even absent a DOE placement offer would foreclose reimbursement for a unilateral placement that was not a 12 month program.  Further, the parent credibly testified that in past years the DOE has provided placement offers late or not at all (T. 341, 343) and I conclude that her failure to make an inquiry was not unreasonable and does not indicate a lack of cooperation.  I also note that the parent's credible claim that she did not receive the IEP until sometime in July (T. 366) has not been disputed or explained by the DOE.  Further, it is well established that the parents' preference for a private school is not a bar to reimbursement.  Accordingly, I conclude that equitable considerations do not warrant denial of reimbursement in the instant matter."

(IHO Dec. 10).  The SRO did not review the IHO's prong three determination on appeal, and the Court therefore gives due deference to the IHO's reasoning.  *See, e.g., V.S.,* 2011 WL 3273922, at *11 (holding that the IHO's determination is due deference where the SRO does not address an issue reached by the IHO) (citation omitted)); *see also C.L., v. New York City Dep't of Educ.*, 12-CV-1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013) *aff'd,* 552 F. App'x 81 (2d Cir.), *as amended* (Feb. 3, 2014).

The DOE briefly argues that the IHO erred in concluding that the equities favor reimbursement, contending that Plaintiffs never "seriously considered" a placement for M.L. in public school and that Plaintiffs engaged in "foot-dragging in the Summer of 2010."  (Def.'s Br. (Dkt. 25) 23.)  The DOE cites the fact that M.L.'s parents waited until August 18, 2010 to reject

---

has failed to submit evidence to support their position that M.L.'s parents received notice of his proposed placement but purposely delayed in rejecting the IEP.

the IEP, "hoping that [M.L.] would enjoy what they believed was the best of both worlds—a district-approved summer program and an inappropriate 10-month private school, all at the public's expense." (*Id.*)  The upshot of the DOE's argument is that the Court should infer bad-faith on the part of Plaintiffs.

Based on the hearing record, and the points elaborated on by the IHO, the Court declines to do so.  M.L.'s parents were fully cooperative throughout the process.  Although the parties have conflicting stories regarding when the parents received the IEP, Defendants submit no evidence to support their version of the events.  Without any such evidence, and giving due deference to the findings of the IHO described above, the Court finds that the equities favor Plaintiffs and reimbursement is justified.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (Dkt. 19) is GRANTED and the DOE's cross-motion for summary judgment (Dkt. 22) is DENIED. Plaintiffs are entitled to tuition expenses for M.L.'s schooling at Imagine Academy for 2010-11 school year.  Additionally, pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), the Court will award reasonable attorneys' fees and costs to Plaintiffs.  Plaintiffs are hereby directed to file with the Court, by no later than October 17, 2014, a particularized request for reasonable attorneys' fees and costs, together with supporting documentation, that complies with 20 U.S.C. § 1415(i)(3)(C). Defendant may file any objections thereto by October 31, 2014, after which the Court will render its final judgment.

SO ORDERED:

_/s/ Pamela K. Chen_____
PAMELA K. CHEN
United States District Judge

Dated:  September 29, 2014
Brooklyn, New York